In the Matter of **ELOISE CURTIS, INC.,**
Bankrupt.

No. 63 B 564.

United States District Court
S. D. New York.

Dec. 6, 1966.

See also 2 Cir., 326 F.2d 698; D.C.,
242 F.Supp. 806.

Hahn, Hessen, Margolis & Ryan, New
York City, for James Talcott, Inc., peti-

tioner for review, Harry A. Margolis, Marks F. Paskes, Julius J. Abeson, New York City, of counsel.

Melvin Lloyd Robbins, New York City, for James G. Foley, opposing petition to review.

WYATT, District Judge.

This is a petition by James Talcott, Inc. (Talcott) to review an order, filed March 15, 1966, of Referee in Bankruptcy Ryan. Bankruptcy Act (Act of July 1, 1898, c. 541, 30 Stat. 544, as amended; the "Act") 39(c); 11 U.S.C. § 67(c).

The order of the Referee disapproved the appointment of New York Credit Men's Adjustment Bureau, Inc. (Bureau) by creditors as trustee in bankruptcy of Eloise Curtis, Inc. (Curtis).

The Act provides that a trustee shall be appointed by the creditors at their first meeting (Section 44a, 11 U.S.C. § 72a) but further provides for approval of such appointment by the Referee (Section 2a(17), 11 U.S.C. § 11a(17)).

The March 15, 1966 order of the Referee also appointed James G. Foley, Esq. (Foley), trustee of Curtis and fixed the amount of his bond. The Act provides in relevant part: "If the creditors do not appoint a trustee or if the trustee so appointed *fails to qualify* as herein provided, the court [Referee] shall make the appointment" (Section 44a, 11 U.S.C. § 72a; emphasis supplied).

Petitioner Talcott is a general non-priority creditor of Curtis for $10,796.21 and is the largest of such creditors. Talcott nominated and voted for the Bureau as trustee at the first meeting of creditors.

The petitioner contends that the findings and conclusions of the Referee are "clearly erroneous" or "patently erroneous" (Brief, pp. 20, 27, 68) and were not the exercise of a judicial discretion (Brief, p. 80) but the result of "bias" and "prejudice" (Brief, pp. 31, 39, 41, 48, 69). The petitioner further contends that, if the Referee did exercise a discretion which is sustained by this Court, the matter should be remanded to the Referee for appointment of a new trustee by creditors, it being asserted that the Referee has no power to appoint under the circumstances here. The petitioner also contends that the order under review is a nullity because of an alleged violation by the Referee of Rule 21(a) of the Bankruptcy Rules of this Court.

■ Two of these contentions may be dealt with summarily.

Rule 21(a), just mentioned, is as follows:

"Referees shall make and file decisions within two months after final submission and shall forthwith give notice of such filing to the parties or their attorneys."

It is asserted for Talcott that the Referee did not make his decision within the two month period. Assuming this to be true (and in view of the lengthy record, it is not surprising), certainly the order of the Referee does not thereby become a "nullity" (Brief, p. 90). The Rule does not so provide; it is highly doubtful that this Court would have authority so to provide. This contention for Talcott is without merit.

■ As for bias and prejudice by Referee Ryan, I conclude after a careful study of the entire record that no bias and prejudice on his part is shown by the record. In disapproving the Bureau, Referee Ryan undoubtedly exercised a discretion as a judicial officer.

■ The issue is not whether this Court would have made the same decision as the Referee made. The issue here is whether the Referee abused the discretion vested in him by Section 2a(17) of the Act (11 U.S.C. § 11a(17)).

Thus the problems raised by the petition to review are (a) whether the exercise of discretion by the Referee in disapproving the Bureau as trustee was within permissible limits and (b) if so, whether appointment of a new trustee is properly to be made by the Referee or by creditors.

The conclusion which I have reached is that the order of the Referee of March 15, 1966 should be in all respects approved and confirmed.

The present petition is but the latest move in a long contest which has required substantial attention from counsel, the Referee, this Court and the Court of Appeals. It may be helpful to an understanding of the present problems if the background events are related chronologically.

## I

Eloise Curtis, Inc. and Young Things, Inc. (Young) are two New York corporations. They made dresses in the same premises at 498 Seventh Avenue in New York City. The ownership of the two corporations was the same. Eloise Curtis and her husband, Harry Jaffe, owned all the stock of Curtis and, although the stock of Young was never issued (and the subscription price never paid), apparently it was in their ownership also. Eloise and Harry directed and operated the two enterprises. Eloise designed the dresses, the piece goods were cut on the premises, and the garments were sewn and finished by outside contractors. Curtis made dresses for women; Young made dresses for children. The only reason there were two corporations instead of one was that union labor on clothes for children is cheaper than on clothes for women. The separation was to facilitate this advantage for the children's clothes.

In the early spring of 1963, Curtis and Young were in serious financial difficulties and their owners, Eloise and Harry, consulted Harris Levin, Esq. They had no operating capital, there were lawsuits pending, in one or more of such lawsuits judgments could be entered shortly, there was a dispossess proceeding, the expected volume of sales had not materialized, the inventory was too large, and the gross profit was too small. The good accounts receivable of both companies had been assigned to MGM Factors Corporation (MGM). The three —Levin, Eloise and Harry—concluded

that liquidation was inevitable and the only question was whether it should be by way of bankruptcy in the federal court or by way of an assignment for the benefit of creditors in the state court (New York Debtor and Creditor Law §§ 1 and following). Levin advised that the assignment method in the state court be used and at his suggestion (because some of the creditors were members of groups affiliated with the Bureau) assignments to the Bureau for the benefit of creditors were executed by Curtis and by Young. The two assignments were delivered to the Bureau on April 3, 1963 and after being accepted for the Bureau on April 4, 1963 they were then recorded on the morning of the same day in the office of the Clerk of the County of New York (Debtor and Creditor Law § 3).

The Bureau called a meeting of creditors of both companies for April 8, 1963 and sent a notice to all such creditors having claims for more than $500. The meeting was held and Joseph S. Herbert, accountant for the assignors, was present to make a report which included, among other things, that in the two campanies designing expenses were so much that the sales were insufficient to enable the business to show a profit. The creditors formed one committee of five members for both companies, the committee being representative of the five largest general creditors. This committee met on the same day and recommended that the Bureau as assignee employ Fred Landau & Co. (Landau) as accountants, and Hahn, Hessen, Margolis & Ryan, Esqs., as attorneys. This was done. The books and records of the two companies were then turned over to Landau and a report from Landau was asked.

Neither Curtis nor Young ever filed the "Debtor's Schedule" (which includes an inventory of all property) required to be filed by them (Debtor and Creditor Law § 4, subd. 1) nor did the Bureau as assignee follow the statutory procedure to compel them to do so (Debtor and Creditor Law § 4, subd. 2).

No assignee in New York may deal with the assigned estate in any way until a bond is filed in an amount determined by the judge (Debtor and Creditor Law § 6).

On April 15, 1963 the Bureau as assignee of Curtis petitioned the state court to fix bond in the amount of $13,000 and to permit a sale of all assets at auction. It was represented that the assets were at 498 Seventh Avenue and consisted of machinery and equipment ($2,000), piece goods and finished garments ($6,000), and equity in accounts receivable ($5,000). An order as prayed for was made by the court at Special Term Part II on April 15, 1963. A file for Curtis was opened at Special Term Part II Assignment Bureau under volume 28, page 29. The Bureau filed on April 22, 1963 a bond as assignee of Curtis.

No order was sought fixing bond as assignee of Young and, of course, no file for Young was opened at Special Term Part II.

The Bureau, in qualifing as assignee of Curtis but not as assignee of Young, took the arbitrary position that all the property at 498 Seventh Avenue belonged to Curtis and that Young had no assets. This was after an explanation by counsel that it "would appear" that Young "had no assets" (SM 700–01), that Herbert had treated the two companies "as a consolidated matter" (SM 701) and that they "would eventually have to consolidate both Eloise Curtis and Young Things into one" (SM 701).

(The stenographic minutes are principally in four volumes, marked I, II, III, and 4; volumes I through III cover the period April 10, 1964—March 8, 1965 and their pages are numbered consecutively in the upper right corner from 1 through 1509 but pages 1508 and 1509 have been renumbered in the lower right corner 1507–A and 1507–B; volume 4 covers the period September 4, 1963— March 16, 1964 and its pages are numbered in the lower right corner consecutively from 1508 through 1683; SM references are to upper right numbers from 1 through 1507 and to lower right numbers from 1507–A through 1683; SM references to minutes after March 8, 1965 identify the date and page number.)

The Bureau, by authority of the state court, sold at auction on April 22, 1963 all the property on the premises of the two companies at 498 Seventh Avenue. Apparently this was on the assumption that everything belonged to Curtis and nothing to Young. The gross amount realized from the sale was $18,606.98, out of which the Bureau paid $2,562.97 to the auctioneer and for expenses.

When Landau was ready to submit a report, the Bureau called a meeting of the committee of creditors. This meeting was held on June 7, 1963. A written report by Landau as of April 4, 1963 was submitted. This gave figures for Curtis and Young separately but treated them in a "combined statement of affairs" (Ex. 6, p. 3).

On a combined basis, it was estimated by Landau that $34,526 would be realized from the assets as follows: from trade accounts receivable (over and above debt to MGM), $11,835; from cash surrender value of insurance policies, $2,300; from cash, employee receivables, merchandise inventory on the premises and furniture and fixtures (at amounts actually realized on auction), $20,391. The unsecured claims of creditors were shown at $273,781. Among the amounts owing to creditors were $383 in "wages payable" and $35,461 in "union benefits payable". This total amount of $35,844 would be preferred in the state court (Debtor and Creditor Law § 22) and, since expenses of administration are paid first out of assets, it was clear on the basis of the Landau report that unsecured creditors would receive nothing on their claims from the assignment proceedings. The Landau report also showed liabilities for federal, state and other taxes amounting to $33,142.

Counsel for the assignee pointed out to the committee of creditors at the June 7, 1963 meeting the preferred status of

the "union benefits payable" in the state court assignment proceedings, namely, that these amounts would be paid in priority to general creditors; he also pointed out that there would be no such priority in bankruptcy. It was then agreed by the committee that, to avoid the state court priority to union benefits, an involuntary petition in bankruptcy would be filed, that the three petitioners required would be three of the creditors represented on the committee, that a letter would be sent out by the Bureau to creditors of Curtis (SM 777) advising that the petition in bankruptcy had been filed and soliciting proofs of claim and powers of attorney running to the committee, that these powers would be voted for the election of the Bureau as trustee, and that the committee as then constituted would become the "official committee" (SM 771) of creditors in bankruptcy (11 U.S.C. § 72b). .

It is of interest to note that bankruptcy was agreed upon by the committee for Curtis only. Young was to be left in the state court. The two corporations were separate entities and their assets and liabilities were separate. However, either in reliance upon advice of counsel or for some other reason, the committee of creditors and the Bureau arbitrarily treated all assets of the two corporations as belonging to Curtis and ignored the assets and liabilities of Young. This procedure was bound to create serious confusion at the least.

It is also of interest to note that the decision in favor of bankruptcy and to eliminate the preferred status of "union benefits payable" was made by general non-priority creditors who had a very remote interest, if any, in the administration of the estate. In bankruptcy, taxes are entitled to priority over general creditors (11 U.S.C. § 104). There were $33,142 in taxes due on a combined basis and on that basis, with expenses of administration being paid first, it was obvious that general creditors would receive nothing in bankruptcy out of an estate estimated to realize $34,526. A member of the committee of creditors

stated at the first meeting of creditors that "tax claims will more than eat up whatever is in it. There is nothing here for creditors, even before we sit down * * * there is nothing there, absolutely nothing." (SM 1514). As was stated by Talcott in a petition verified April 8, 1964: "The priority tax claims will consume all of the sums which will be on hand after the payment of proper administration expenses".

What in fact will happen to the claims of creditors of Young, after treatment of all assets as belonging to Curtis, is an intriguing matter of speculation.

In any event, the general non-priority creditors without any real interest in the matter were able to determine that the assets should be distributed in bankruptcy to pay tax claims rather than in assignment proceedings to pay union benefit claims.

On June 27, 1963, an involuntary petition in bankruptcy was filed in this Court against Curtis by three creditors (one of them being Talcott) whose representatives were members of the committee of creditors. The act of bankruptcy was alleged to be the assignment for the benefit of creditors (11 U.S.C. § 21a(4)). The attorneys for the petitioning creditors were the same attorneys who had been retained by the Bureau as assignee of Curtis and Young.

On the default of Curtis, Judge McMahon made an order on July 17, 1963, adjudging Curtis a bankrupt and referring the matter to Referee Ryan.

No petition in bankruptcy has ever been filed against Young. The Bureau is in theory still acting as assignee of Young under state law but has in general proceeded on the mistaken assumption that Young had no assets.

The first meeting of creditors of Curtis took place on September 4, 1963. A member of the committee of creditors attended the meeting with powers of attorney from 79 general non-priority creditors who had filed claims aggregating $69,807.17 (Ex. 49), out of $94,198 total owed by Curtis to general creditors

(Ex. 6, p. 5) or about 75% in dollar amount of claims of general creditors. Talcott nominated the Bureau as trustee, there were no other nominations, the claim of Talcott was found by the Referee to be "proper for voting purposes" (SM 1510), and such claim was voted for the Bureau as trustee. The other claims were not voted because there was no necessity to do so. The Referee found that the Bureau had been appointed as trustee (SM 1511). The Referee fixed the bond of the trustee at $16,000 but postponed the filing of a bond until after his decision whether to approve. At the first meeting, there was also appointed by the creditors a committee of five, the members being the same as those who had been on the committee in the state court assignment proceedings.

The Referee at the first meeting on September 4, 1963, stated a belief that "the assignee for the benefit of creditors is not qualified to be elected trustee, because he has a definite conflict of interest * * *" (SM 1514). He adjourned the meeting to September 16 to give Talcott an opportunity to put anything on the record to indicate why the Bureau was not disqualified (SM 1510).

There was a hearing at the adjourned meeting on September 16 at which Talcott presented the testimony of the assistant secretary of the Bureau.

By order with opinion filed September 30, 1963, the Referee disapproved the appointment of the Bureau as trustee because it had been assignee and its accounts as such were unsettled. The Referee by the same order appointed Foley as trustee and fixed his bond at $16,000. Foley filed the required bond on October 3 (11 U.S.C. § 78b). The Referee approved the retainer by Foley of Melvin Lloyd Robbins, Esq., as his counsel.

On October 9, 1963, in the motion part I granted a motion by Talcott to stay Foley from acting as trustee pending decision by the District Court of the petition by Talcott to review the September 30 order of the Referee.

On October 10 at the adjourned first meeting a member of the committee of creditors attempted to nominate another trustee, taking the position that upon disapproval by the Referee of a trustee, creditors (and not the Referee) had the right to appoint a new or substitute trustee. The Referee refused to permit the nomination by creditors of another trustee.

By order with memorandum filed November 6 Judge Murphy confirmed "on the opinion of Referee Ryan" the order of Referee Ryan of September 30, both as to disapproval of the Bureau as trustee and as to appointment of Foley as trustee. Judge Murphy also vacated my stay of Foley acting as trustee.

Talcott then filed notice of appeal to the Court of Appeals from the November 6 order of Judge Murphy.

By order filed November 13 Judge Murphy stayed Foley from acting as trustee pending decision on the appeal. The stay was later modified to expire December 2 so as to enable the Court of Appeals to determine whether there should be a stay.

By order filed November 21, the Referee ordered the Bureau to account to the bankruptcy court as assignee of Curtis. The Bureau filed such an account on November 29.

On December 2, 1963, the Court of Appeals granted a motion by Talcott for a stay of Foley acting as trustee. Argument of the appeal was set in the same order for December 9.

On January 23, 1964, the Court of Appeals reversed the order of Judge Murphy (326 F.2d 698; Smith and Hays, C.JJ.; Clark, C.J., had heard oral argument but did not participate in the decision). Judge Hays for the Court stated that the Bureau should not be disapproved as trustee solely for the reason that it had been assignee, but that the Referee "should exercise his discretion in the light of the particular facts be-

fore him", and that in the case at bar there "may be a question as to the Bureau's eligibility to act as trustee in the light of its conduct as assignee" (326 F.2d at 701). The Court of Appeals did not consider this last question but noted that it would be "relevant to the referee's deliberations on remand" (326 F.2d at 701). The Court of Appeals remanded the case "with instructions to the referee to determine the issue as an issue of discretion, rather than an issue of law" (326 F.2d at 701). The Court of Appeals declined to pass on the question whether, on disapproval of a trustee, the Referee had the right to appoint a trustee (326 F.2d at 701).

At adjourned first meetings on February 13 and 17, 1964, Talcott suggested that the Referee should hold hearings on the qualifications of the Bureau as trustee. The Referee declined and on February 17, 1964, filed a "memorandum on remand". This explained that the September 30, 1963, order had been made in the exercise of discretion. The Referee continued "to decline to approve the appointment of the Bureau as the trustee" and stated: "James G. Foley shall continue to serve as trustee".

Talcott petitioned for review of the February 17, 1964 order and on April 8, 1964, Judge Palmieri signed ex parte an order staying Foley from acting as trustee until hearing of an order to show cause seeking the same relief.

By order with opinion filed July 29, 1964 Judge Bryan reversed the Referee's February 17, 1964 order "because under the unusual circumstances which exist here the ends of justice will be better served by giving Talcot an opportunity to present any further proof which may be available on the questions raised and because a full hearing on the subject may cast light on the dark corners which it has been inferred may exist." Judge Bryan declined to pass on the authority of the Referee to appoint Foley as trustee. Judge Bryan remanded for further hearings.

The further hearings directed by Judge Bryan commenced before the Referee on September 30, 1964. Counsel for Foley appeared. Counsel for the Bureau and for Talcott objected to any participation by Foley in the proceedings on the ground that the order appointing Foley had been reversed. The Referee overruled this objection and counsel for Foley did participate in the proceedings.

Evidence was presented at hearings on September 30; on November 13 and 19; on December 2 and 11, 1964; and on January 18, 1965.

On January 19, 1965, counsel for the Bureau (being the same as counsel for Talcott) presented to the Referee an application for approval of the payment of a bill of the reporter for stenographic minutes of the hearings before the Referee. The payment was to be made out of funds in the hands of the Bureau as assignee of Curtis. The Referee declined to approve the application because it was "very carefully couched in terms that studiously avoid any recognition of the status of Mr. Foley" (SM 1057), whereas the Referee believed Foley to be the lawfully appointed trustee (SM 1057).

The hearings thereafter continued for the receipt of evidence on January 19, 20 and 22, 1965, and on March 8, 1965 at which time there was an adjournment to April 12, 1965.

Evidently concerned, among other things, over payment of the reporter for the stenographic minutes (a problem left open by his refusal to approve payment by the Bureau as assignee), the Referee on his own initiative made an order on January 21, 1965, directing the Bureau to turn over to Foley, as trustee of Curtis, all property of Curtis in the hands of the Bureau as assignee of Curtis. The Bureau was also ordered "fully to account * * * by filing * * * a detailed supplemental statement, under oath, showing further disposition". It was recited in the preamble to this order, among other things, that the accounting of the Bureau as assignee, filed November 29, 1963, appeared to be "not complete".

The Bureau applied to the Referee for an extension of time within which to file a petition to review his January 21, 1965 order. By memorandum and order filed January 29, 1965, this application was denied as "without merit"; the memorandum was critical of the Bureau both as to the Curtis estate and as to its practices generally.

On the same day as the last described order of the Referee, either before that order was filed or being unaware of its filing, the Bureau obtained from Judge Metzner an order extending its time to petition for review of the January 21, 1965 order of the Referee and staying compliance with that order pending determination of the petition to review.

On February 11, 1965, the Bureau filed its petition to review the January 21, 1965 order.

Bankruptcy Rule 21(c) of this Court is as follows:

> "To enable referees to comply with Section 39a(8) of the Bankruptcy Act, the party who files with the referee a petition to review a referee's order, shall, within ten days thereafter, or within such further time as the referee may for cause shown allow, furnish the referee with (1) a transcript of the evidence or a summary thereof agreed on by the parties; (2) all exhibits, and (3) the expense, if any, of transporting the same to the clerk."

On February 24, 1965, the Referee, acting under this rule, made the following order:

> "ORDERED, that the petitioner for review shall, on or before the 8th day of March, 1965, furnish the undersigned with (1) a transcript of the evidence or the summary thereof agreed on by the parties, and (2) all exhibits not heretofore furnished to the Court.".

The Bureau filed a petition to review this February 24, 1965 order.

In addition to the two petitions to review, two orders to show cause were obtained.

By order signed March 4 and filed March 5, 1965 and on petition of the Bureau, Judge Levet required Referee Ryan to show cause before this Court why his February 24, 1965 order should not be vacated. Pending determination of this application Judge Levet stayed compliance by the Bureau with that order of the Referee.

By order signed March 19 and filed March 24, 1965 and on petition of Talcott, Judge Cannella required Referee Ryan to show cause before this Court why his January 21, 1965 order should not be vacated.

Talcott applied to the Referee for an adjournment of the hearings before him until after determination by this Court of the two petitions to review and the two orders to show cause. This was denied by the Referee on April 6, 1965.

The two petitions to review and the two orders to show cause were argued on April 20, 1965 before Judge Cashin. The United States Attorney appeared for Referee Ryan on the orders to show cause and submitted an affidavit in opposition.

By order filed April 22, 1965, and on petition of Talcott, Judge Cashin stayed further sessions of the hearings before the Referee until determination of the matters argued before Judge Cashin.

The opinion and decision of Judge Cashin was handed down on June 24, 1965 and is reported in 242 F.Supp. 806. Judge Cashin decided that the appointment by the Referee of Foley as trustee was void as beyond the Referee's power because there is nothing in the Act "to imply that the Referee may appoint an interim trustee while disqualification proceedings are pending or that a nominee of the Referee may act as trustee while a disqualification order is awaiting review" (242 F.Supp. at 808). Judge Cashin declined to comment on "the Referee's power to appoint a new trustee after a proper disqualification" (242 F.Supp. at 808). Having decided that Foley had no standing on January

21, 1965, Judge Cashin reversed the turnover order of the Referee of that date. The petition to review the February 24, 1965 order was held to be moot. The orders to show cause were treated as moot and the practice of obtaining such orders was disapproved "when the normal appeal procedure, through petition to review, is available" (242 F.Supp. at 808).

The decision of Judge Cashin points to a gap or defect in the present procedure. There was a considerable period of time during which the Referee was conducting hearings to determine whether the trustee chosen by general creditors should be approved or disapproved. Prior to the decision of Judge Cashin, Foley (the trustee theretofore appointed by the Referee) had participated in the hearings. It was counsel to Foley, doing yeoman service, who developed the facts as to the performance by the Bureau as assignee in the state court. Judge Cashin's decision seems correct but after that decision Foley could not participate in the hearings, the proceedings were no longer adversary, and further development of the facts was not possible. Whether a receiver in bankruptcy, if appointed in such a situation, would be justified in contesting the choice as trustee of the creditors is doubtful but in any event the Referee could not by local rule (Bankruptcy Rule 8) appoint a receiver and neither the Referee nor a judge of this Court could appoint a receiver except "upon the application of parties in interest" (Section 2a(3), 11 U.S.C. § 11a(3)).

Up to this point, there had been no qualified trustee to administer the estate of Curtis which had been adjudicated a bankrupt almost two years before, on July 17, 1963. The appointment of the Bureau had not been approved by the Referee; the appointment of Foley had been declared void by Judge Cashin. The administration of the estate by Foley had been stayed for most of the time since his appointment by the Referee.

In view of the then situation, a receiver was appointed by Chief Judge Sylvester J. Ryan.

By order filed July 6, 1965, and on application of Talcott (apparently ex parte), Judge Ryan appointed John Paul Reiner, Esq., receiver to take charge of the property of the bankrupt Curtis. Act § 2a(3), 11 U.S.C. § 11(a)(3). The receiver promptly qualified as such and all property of Curtis held by the Bureau as assignee and by Foley was promptly turned over by them to the receiver.

Meanwhile the Bureau came to life as assignee of Young in the state court. The Bureau executed a petition on July 1, 1965 asking that the amount of a bond as assignee of Young be determined. It was represented that $966.46 had been received from various accounts receivable of Young, that there was a receivable from the factor of $2,391.51, and that the Bureau has "no knowledge, information or belief with respect to any other assets". An order was made on July 2, 1965 fixing $4,000 as the amount of the bond of the Bureau as assignee of Young. A file for Young was opened at Special Term Part II Assignment Bureau under volume 29, page 45. The Bureau filed on July 12, 1965 a bond as assignee of Young.

The Court of Appeals (Moore, Smith, and Anderson, C.JJ.) by order, without opinion, filed September 24, 1965, unanimously affirmed the order of Judge Cashin; this decision of the Court of Appeals is not reported.

After the decision of Judge Cashin on June 24, 1965, Foley, as already noted, had no standing in the qualification hearings being conducted before the Referee. On October 15, 1965 counsel for Talcott advised the Referee "that Talcott was willing to rest on the record as it now stands" (SM, October 15, 1965, p. 45–A) and on that date the record shows that the "hearing under Judge Bryan's order was closed" (SM, October 15, 1965, p. 46–B).

According to the March 15, 1966 opinion ("Op.") of the Referee (Op. 4), the hearing was concluded on November 15, 1965—evidently the date when the exhibits and other material were submitted by counsel for Talcott to the Referee.

Thereafter on March 15, 1966 the Referee filed the order with opinion which is here on review. The Referee again disapproved the Bureau as trustee of Curtis and appointed Foley in its place. In April 1966 the receiver of Curtis turned over to Foley all property of Curtis then in his hands; in the same month the receiver asked the Referee to settle his accounts and while this has not yet been done, apparently the receiver has ceased to act as such. By order filed May 6, 1966, Judge Frankel stayed Foley from administering the estate until determination of this present petition to review.

## II

■ It is not clear whether the Referee, in exercising the discretion now under review, found the Bureau in general—that is, apart from its activities in this particular insolvency—to be not sufficiently competent and independent to serve as a trustee in bankruptcy. In his conclusions, the Referee stated that the issue involved "the competency of the candidate in general" (Op. 61). In his findings, the following appear to be directed to the Bureau in general and to be intended as criticism:

a. The Bureau is a member of a group of affiliated corporations which is complex (Op. 32–37).

b. One of the members of the group is Tri-State Service Corporation (Tri-State) which for a profit acts as a warehouseman for the Bureau and performs clerical services for the Bureau. This means that the Bureau as trustee would not be dealing with its warehouseman at arm's length but would be dealing with an affiliate (Op. 38–40).

c. The Bureau usually employs as auctioneer Arthur Albert & Co. which controls the building in which the Bureau has its offices, occupies part of the building and leases to the Bureau or Tri-State (Op. 40–41).

d. The auditors employed by the Bureau "qualify their audits and withhold verification or certification of the Bureau's financial statements" (Op. 41).

e. The Bureau is a "pliant and obedient servant" (Op. 47) of the creditor members, especially of any committee of creditors in an insolvency proceeding (Op. 45–48).

f. The Bureau as assignee or trustee always retains as its attorneys that law firm recommended by the committee of creditors, meaning the largest creditors (Op. 48, 49). Since the Bureau is "supine", it is the attorneys who "dominate the administration" (Op. 49).

g. The Bureau has retained as its attorneys in most of its important insolvency matters one or the other of four named law firms (Op. 50–54).

h. The Bureau turns over to its attorneys the collection of accounts receivable but large law firms cannot handle collections economically; therefore, "the Bureau creates a partial vacuum in collection efforts" (Op. 55).

Petitioner Talcott believes (Brief, p. 65) that the Referee, despite the criticisms noted, did not intend to find the Bureau generally disqualified to be a trustee in *any* bankruptcy but disqualified only in the case before him—the bankruptcy of Curtis. Apparently respondent Foley agrees with this interpretation (Brief, p. 53).

Whether this be the correct interpretation or not, it would seem proper to state that it would in my opinion be an abuse of discretion if the Bureau, on the basis of the findings of the Referee set out above, were generally disapproved as a trustee in bankruptcy of any estate.

One of the findings above, that relating to control by the auctioneer Albert of the building where the Bureau has offices (c above), is admittedly in error. The explanation of the error is probably

that the record itself is confusing on the point and the Referee may have been misled thereby. Feldman, secretary of the Bureau, testified as to storage space rented by Tri-State: "I think they are on a lease or sublease of Harold [Arthur] Albert & Company. The rent is $395 per month at the present time" (SM 1401). Tri-State does sublet space at 71 West 23d Street (in the same building with the Bureau) but not from Albert (Ex. 70, p. 3). It appears that Albert is a firm of licensed auctioneers (New York City Administrative Code, § B 32–138.0 and following (1964)) and that its offices are at 391 Park Avenue South in Manhattan (Exs. 42, 43). It does not appear in the record but I accept the statements in the brief for petitioner (pp. 59–60) as to the ownership of the building at 71 West 23d Street, from which it is evident that Albert has no interest in that building.

As to the finding of a "partial vacuum in collection efforts" (h above), there is no evidence in the record to support such a finding as a generality. There is no evidence that the Bureau always turns over to attorneys all collection efforts on accounts receivable; on the contrary, there is evidence that as a general rule the Bureau does itself collect accounts receivable (e.g., SM 830–31). The suggestion of the Referee is that the Bureau has a motive to avoid collecting accounts receivable "in order to protect its tax exempt status" (Op. 55). This suggestion appears to be based on a misapprehension. While the Bureau is not organized for profit and while its certificate of incorporation contains language appropriate for federal tax exemption as a "board of trade" (26 U.S.C. § 501 (c) (6)), the Regulations have for many years provided that such organizations must not "engage in a regular business of a kind ordinarily carried on for profit" (Treas. Reg. § 1.501(c) (6)–1). It has been held that credit activities are "of a kind ordinarily carried on for profit". Credit Bureau of Greater New York v. C.I.R., 162 F.2d 7 (2d Cir. 1947). The Bureau would not seem, therefore,

to have any "tax exempt status" nor does it seem to claim any such status. I do not find anything in the record to support the observation of the Referee in respect of collections that "a major law firm" cannot economically collect accounts receivable (Op. 55). It may well be true but without some evidence that it is true, the observation cannot serve as a basis for general disapproval of the Bureau as a trustee.

As to the practice of the Bureau in retaining attorneys (f and g above), I see nothing in this to merit general disapproval. There is express provision in the Act for a committee of creditors (11 U.S.C. § 72). I find nothing to indicate that the various attorneys retained by the Bureau were incompetent, unprofessional, or in any way disqualified. That a relatively small number of law firms have beeen retained by the Bureau would appear to be irrelevant to any issue here (see Op. 52–54).

The evidence does not support the finding (e above) made by the Referee —on the basis of a publicity brochure of the Bureau (Ex. C)—that the Bureau is in all cases "a pliant and obedient servant of the creditors who belong to the Bureau as members, particularly those creditors whose representatives constitute the creditors' committee in the particular insolvency proceeding" (Op. 47). I have studied the brochure and that part of it quoted by the Referee (Op. 46). It seems tolerably clear that this quoted language refers, as Feldman testified (SM 517–20, 583), to out of court insolvencies rather than to assignment or bankruptcy proceedings.

That the auditors of the Bureau "qualify their audits" etc. (d above) seems irrelevant to any issue here, as does the fact that no financial statements were presented of affiliated corporations (Op. 42–3). The Referee does not find that the Bureau is financially irresponsible or that its books are kept in an improper manner. The reason why the auditors "qualify" their opinion seems entirely understandable and reasonable. They were not asked to, and did not, audit

"the assets and liabilities of estate accounts" (Ex. M; Op. 42), that is, of estates in which the Bureau was acting as assignee, trustee or in some other capacity. To do so would not only be an enormous and expensive task (at April 30, 1964, the total cash on hand of such estates appears to have been $7,800,000, see Ex. M, Op. 42) but would duplicate the work being done in each such estate by the respective accountants engaged for the purpose. It would also appear that the Bureau would be required to account to the state court in assignee proceedings and to the bankruptcy court in bankruptcy proceedings. Moreover, the Bureau has presumably filed a bond in each of the estates, certainly in those in state or federal court, and can be required to file a bond in the case at bar (11 U.S.C. § 78).

The Referee correctly finds (Op. 39) that Tri-State supplies a storage, multigraphing, clerical and mailing service to the Bureau and to other affiliated corporations (SM 1400–02). The Referee correctly finds that the Bureau and Tri-State are affiliated. I find no justification, however, for his statement that Tri-State is "an apparently independent but actually controlled affiliate" (Op. 40). The implication is that there is some masking or concealment involved, whereas from the record as I understand it the affiliation is open and notorious and the two corporations are in the same building at 71 West 23d Street. I see no reason why the Bureau should be disqualified as trustee because an affiliate performs certain services. There might indeed be some advantages from such a practice, since the cost might well be reduced when spread over the operations of all the corporations affiliated with the Bureau, rather than absorbed by the Bureau alone. Whether amounts paid to Tri-State for particular services should be reimbursed to the Bureau as a trustee in bankruptcy is to be determined by the bankruptcy court as in the case of all other disbursements by a trustee, on audit by the Referee of the accounts of such trustee (11 U.S.C. § 75a

(13); General Order 17(4)). This seems to have already been recognized as an applicable principle by the Court of Appeals in its opinion on the first appeal in this matter (326 F.2d at 701).

The Referee has correctly found the relationships between the several corporations affiliated with the Bureau. New York Credit & Financial Management Association (the New York Association) has been since about 1905 a non-profit membership corporation for cooperative credit and financial discussion and exchange (SM 461). It is affiliated with National Association of Credit Management, a non-profit membership corporation organized in 1896 and made up of credit groups similar to the New York Association and located all over the country (SM 457). The New York Association is the sole voting member and thus the parent of the Bureau, and controls the Bureau (SM 459, 460, 471–2). This setup was devised to avoid the danger to the tax exempt statute of the New York Association itself which, as seen from the explanation already made, would result if it—rather than the Bureau—carried on adjustment, liquidation and collection activities (SM 458). The New York Association owns all the stock of Tri-State, a stock corporation (Ex. 70). The New York Association also owns all the stock of New York Credit Group Service, Inc., a stock corporation which furnishes services to separate industry credit groups, such as supplying a meeting place for exchange of information, furnishing personnel to manage, supplying secretarial assistance, etc. (SM 469–70. It may be that the Referee is correct also in referring to the "complexity of the group" but considering the enormous size and variety of the New York commercial community, this would not be surprising. The directors of the Bureau (Ex. 12) appear to represent reputable and substantial commercial enterprises and so far as appears from the record the New York Association and its affiliates are long established and trustworthy organizations. If it be the conclusion of the Referee that there are "in-

herent conflicts of interest" (Op. 32) which necessarily disqualify the Bureau in any insolvency, this in my view is erroneous.

For the reasons indicated, I would not approve a general disqualification of the Bureau as trustee. As already noted, the Referee may not have intended such a general disqualification.

### III

When the focus of attention is shifted to the activity or inactivity of the Bureau as assignee in the state court, the criticisms of the Bureau by the Referee appear to be for the most part clearly justified.

### A.

The Referee was properly critical of the manner in which the Bureau, its counsel and its accountants ignored the separate assets and liabilities of Curtis and of Young (Op. 18–23, 64–5).

The general relationship between these two corporations has already been noted. However close that relationship may have been, they had separate assets, separate liabilities and creditors, and separate books of account. They filed separate tax returns (SM 1280).

Joseph S. Herbert & Company (Herbert) had been the accountants for Curtis and Young for several years before the assignments on April 3, 1963. The fiscal year for both companies ended on March 31.

The direct, separate expenses of each company were regularly entered in its books. There were some overhead expenses paid by one company which were for the benefit of both and these were allocated between them by formula on the basis of sales; such, for example, were rent, telephone, electricity, and some salaries (SM 1148–49). There were also many transactions between the two companies which required adjustment entries on their books to reflect the state of accounts between them, for example, if one company used piece goods owned by the other (SM 1149) or if direct labor paid for by one company was employed by the

other (SM 1153); these adjustments were made by Herbert on an actual cost, not a formula, basis (SM 1153). The allocation and the adjustment entries were made by Herbert monthly in their work papers and were reflected in their monthly reports to the two companies (Exs. H, I, J; SM 1235, 1238); only at the end of each fiscal year were the adjustment entries given by Herbert to the bookkeeper of the two companies for entry on the *companies'* books (SM 1235). Thus, at any time during the fiscal year the books of the two companies did not accurately reflect the state of affairs between them (SM 1239). Only the Herbert monthly reports and their work papers would show this accurately. Since Herbert made their last report for January 31, 1963 and did not do an audit for the fiscal year ending March 31, 1963, there were no adjusting entries on the books of the two companies for the period after March 31, 1962. As the Referee properly observed, the Herbert work papers "in effect" were "part of the debtors' books and records" (Op. 20).

There are in evidence a number of financial reports prepared by Herbert, the last one being at January 31, 1963 (Ex. H). All but one of these were produced before the Referee by Herbert, along with their work papers, at the instance of counsel to Foley. Only one Herbert report (Ex. P), that at December 31, 1962, was delivered by the Bureau to Landau, apparently by happenstance among the books and papers from the Seventh Avenue premises; this must have been shortly after April 4, 1963. No other reports by Herbert were seen by Landau (the Referee must be mistaken in stating (Op. 20) that Landau had the Herbert report dated March 12, 1963).

Neither the Bureau, nor its counsel, nor its accountants ever asked Herbert for any of their reports or workpapers (easily obtainable); they never asked Herbert for any information. This seems inexcusable neglect, especially in view of the invaluable knowledge of Herbert as to the transactions between the

two companies and as to the identification of their separate assets.

The last Herbert report showed that at January 31, 1963 Young had inventory of $35,822.46 on a "necessary to break even" basis (Ex. H; SM 1239–41). The Landau report shows that at April 4, 1963 Young had inventory of $34,526 (Ex. 6, p. 4). This inventory consisted of piece goods, trimming and linings and finished garments at 498 Seventh Avenue, and cut piece goods at sewing contractors (SM 1241, 1247–48). All of this inventory at 498 Seventh Avenue could have been identified from the piece goods book, cutting tickets, records of purchases of trimming and linings, style numbers and tags on finished garments (SM 1241–49). The Bureau made no attempt to identify the inventory but sold it all as belonging to Curtis and took in the proceeds as assignee of Curtis.

The goods at sewing contractors were likewise identifiable because Curtis and Young naturally dealt with different contractors (SM 1184); as already explained, Young was separately organized for this very purpose. As later shown, Landau was able to identify the contractors of Curtis and those of Young but in any event the Bureau did nothing about it.

Instead of seeking information from Herbert, or Harry, or the bookkeeper (Miss Bernstein) of the two companies so as to enable all the separate assets to be identified, they were simply treated as all belonging to Curtis. According to the Bureau accountants, this was because when they looked "at the books and records", they felt that they "couldn't separate the two" (SM 1217). Apparently the effect on creditors of the two companies was ignored, this on the assumption that "most" of the creditors were "on both sets of books" (SM 1218–19). According to counsel for Talcott "these corporations were simply one and so treated for all purposes" (SM 1106).

Having arbitrarily assumed that all assets belonged to Curtis and that Young had no assets, naturally the Bureau made no attempt to identify any assets separately as those of Curtis or Young.

Disregard by the Bureau of the separate character of the two corporations had further consequences.

The Landau report (Ex. 6) showed that at April 4, 1963 officers owed to Curtis $2,618 and to Young $23,934 (which last included subscription to stock of $1,000). This was due from Harry Jaffe, perhaps as to a relatively small amount from Eloise (SM 1116, 1220–24, 1227, 1273, 1275). There was a loan payable by Curtis to officers of $133,868 but this was subordinated (Ex. K; SM 1117, 134–35). The accountants of the Bureau set off the receivable to Young of $23,934 against the payable by Curtis of $133,868 (Ex. 6, p. 8). This was on the theory that they were "simply one" and despite the fact that the payable was subordinated to other creditors. The Bureau knew from the Landau report (Ex. 6, p. 8) if not earlier that there was subordination but made no inquiry about it and never examined the subordination agreements (SM 900).

Herbert had felt that the withdrawals by Harry from Young while there were subordination agreements with Curtis were "unusual"; these withdrawals had made Herbert as accountants "extremely unhappy" (SM 1287). Indeed most of the withdrawals from Young were made by Harry after April 1962 and at a time when Young was insolvent (SM 1300).

The Bureau made no effort to collect the receivables due from officers to Curtis or to Young (SM 897). This was on the theory that it was not "an asset of the estate" of Curtis because of the set-off (SM 898), and the setoff was attempted to be justified by the Bureau because "in the normal course of this estate * * * both matters would have been consolidated" (SM 899). As to the receivable due from officers to Young, there appears to be no possible justification for the setoff since the debt due *to* officers was due from Curtis, not from Young (see SM 1137–38); the separate and different creditors of Young had an obvious interest in the receivable as an

asset of the insolvent estate. And, of course, the two estates were never "consolidated"; indeed, they were so far divorced that one is now in this Court and the other in the state court.

The neglect by the Bureau of the receivables from officers is not excused by doubt as to their collectibility. A member of the creditors' committee testified that Harry "never had a dime" (SM 984) but this was based on rumor and not knowledge. The Bureau made no inquiry as to his financial condition. It may also be noted that even as to Curtis there should have been no question of setoff because the payable was subordinated.

Moreover, after having treated the two companies in the state court as "simply one", there was every reason to have both estates administered in bankruptcy if one was to be so administered. Indeed, at the meeting on June 7, 1963 of the committee of creditors when bankruptcy was agreed for Curtis, it was said of the two companies that "they both belong together" (SM 983). Yet no petition was filed against Young. The result is a most awkward situation, which could have easily been avoided had not Young been ignored. The Bureau could not itself have petitioned Young into bankruptcy, but it could have advised the step and could have refused to act as assignee or as trustee of Curtis unless it was done. Instead the Bureau ignored the problem and thereby increased the confusion already existing. Responsibility cannot be shifted from the Bureau to its lawyers or accountants because the question was one of common sense and business judgment.

The confusing, careless and illogical treatment by the Bureau of the separate assets and liabilities of the two companies, and its then acquiescence in the inconsistent divorce of their insolvency administration between the federal and state court, are enough fully to justify the criticisms of the Referee.

## B.

The Referee was properly critical of the neglect by the Bureau of trade accounts receivable of both Curtis and Young (Op. 25–29, 62–63) during the period from April 3, 1963 (when the assignments were executed) to June 27, 1963 (when the petition in bankruptcy was filed).

The books showed that at April 4, 1963 Curtis had accounts receivable of $77,258 less "allowance for sales discounts" of $6,626 and less "allowance for doubtful accounts" of $10,995 (Ex. 6, p. 4). The Landau report showed net accounts receivable of Curtis of $59,637.

The books showed that at April 4, 1963 Young had accounts receivable of $25,554 less "allowance for sales discounts" of $1,811 and less "allowance for doubtful accounts" of $1,100 (Ex. 6, p. 4). The Landau report showed net accounts receivable of Young of $22,643.

Both Curtis and Young had assigned all their accounts receivable (except "doubtful") to MGM to secure loans under a continuing finance agreement (Ex. 68). This agreement provided that Curtis and Young were "privileged" to collect the accounts receivable for MGM and obligated to turn over the collections to MGM (Ex. 68, paras 3 and 5). This privilege was automatically to terminate upon any insolvency proceedings (Ex. 68, para 3). Consistently with these provisions MGM had not, prior to April 4, 1963, notified the debtors of the assignment (SM 1338).

The financing agreement with MGM also provided (Ex. 68, para 16) that, in the event of an assignment for the benefit of creditors, MGM

"shall have the right to retain counsel to represent it and protect its rights and interests hereunder and [Curtis, Young] shall and hereby covenants that it will pay to [MGM] the fees of such counsel, the amount of which fees is hereby fixed at a sum which shall be equal to 15% of [MGM's] cash advances to [Curtis, Young] which may be outstanding at the time of [such assignment for the benefit of creditors]".

The amount owed by Curtis to MGM on April 4, 1963 according to the MGM books was $44,750.85 (Ex. S) against which Curtis had assigned to MGM accounts receivable of $59,637 according to the Landau report (Ex. 6, pp. 4, 7 (note 1)).

The amount owed by Young to MGM on April 4, 1963 according to the MGM books was $14,359.76 (Ex. T) against which Young had assigned to MGM accounts receivable of $22,643 according to the Landau report (Ex. 6, pp. 4, 7 (note 1)).

The amounts shown above as owed to MGM by Curtis and Young on April 4, 1963 are not exactly the same as those found by the Referee (Op. 25) but the difference is of no significance and is probably because the Referee calculated from the Landau report alone whereas I have used figures from the MGM books.

The accounts receivable classified "doubtful" ($10,995 in the case of Curtis and $1,100 in the case of Young) apparently were not assigned to MGM (Ex. 6, pp. 3, 4). The Bureau seems to have made no effort to determine whether any of these doubtful accounts could be collected; it did nothing as to them.

As to the assigned accounts receivable, MGM sent a notice to the debtors of both companies about April 4, 1963 telling the debtors that future payments should be made only to MGM (SM 1338).

The Bureau learned on April 3, 1963 of the assignment of the accounts receivable to MGM, and that Harry believed there was an equity of $15,000 (Ex. 21; SM 706).

As noted above, on April 4, 1963, Curtis owed MGM $44,750.85 and Young owed MGM $14,359.76. On that day, however, MGM made a charge to the accounts of Curtis and Young of 15% of these amounts owed, relying on the "counsel fee" provision quoted above from the financing agreement. It does not appear that MGM had in fact retained counsel or needed any counsel to "protect its rights and interests"; the charges were probably improper. The amount charged to Curtis was $6,712.63 (Ex. S) and to Young $2,153.96 (Ex. T).

Neither the Bureau, nor its accountants nor its lawyers, appear to have acted on or after April 4, 1963 to find out from MGM what the state of accounts was between MGM and Curtis and between MGM and Young. Whether this failure to act was deliberate or was the result of neglect, it seems to have been a serious mistake.

After April 4, 1963, both MGM and the Bureau received payments of accounts receivable. Some debtors sent checks to the Bureau, despite the notice from MGM.

The Bureau and its lawyers decided that the checks received by it from debtors should be turned over to MGM. The financing agreement required this, so long as there were moneys owing to MGM. But the Bureau did not know how much was due MGM or how much MGM had received from the accounts receivable and in particular did not know of the 15% charges made by MGM on April 4. Nevertheless between April 4 and May 22, 1963 the Bureau through counsel turned over to MGM all payments received by it from debtors of Curtis and Young (the turnovers were made with express reservation of all rights and disclaimer of any waiver). The amount thus turned over by the Bureau to MGM was $42,717. The Bureau appears to have been laboring under the misapprehension, induced by the Herbert oral report on April 8, 1963 (SM 722), that MGM was owed $91,000 whereas the actual amount was $59,110.61 (Exs. S, T).

Some time about May 22, 1963, Landau evidently learned that charges in some amounts had been made by MGM to Curtis and Young on April 4, 1963. The lawyers for the Bureau then wrote to MGM asking for the amount and the authority for the charges. The lawyers declared that no further payments of accounts receivable would be turned over to MGM "until this matter is settled" (Ex. 66).

On and after May 22, 1963, all payments received by the Bureau from accounts receivable were on advice of counsel retained and kept in a special bank account. All the Bureau knew was that it was advised by counsel that "the factor was making improper charges" (SM 882). MGM was not advised of the debtors who made payments after May 22.

The Bureau had been merely receiving payments which were sent in by debtors. It had made no efforts to collect anything; it did nothing to stimulate debtors to pay (SM 834). It never saw the financing agreement with MGM (SM 836), it never saw any statement of account of MGM (SM 832), it did not know what MGM was doing to collect accounts receivable (SM 845, 1033), it mistakenly thought that MGM had not notified the debtors (SM 1031), and it never had anything to do with MGM, by way of inquiry or otherwise (SM 820–21, 830–31, 845). The Bureau did not follow in this instance what was described in testimony as its normal procedure (SM 1030).

After MGM notified the debtors to pay only to it, MGM made "a very concentrated effort at collection" of accounts receivable (SM 1340). When the Bureau on May 22, 1963 stopped turning over to MGM the payments received, MGM was told by counsel to the Bureau to stop all efforts to collect (SM 1340, 1341, 1348); accordingly MGM "stopped collecting" (SM 1345). The Bureau disputes a finding in this respect by the Referee (Op. 28), but there being supporting testimony in the record of a representative of MGM, there is no basis for any reversal of the finding. In any event, it was impossible for MGM to make further collection efforts because it did not know what payments were being received by the Bureau after May 22, 1963, and thus could not know what debtors still owed Curtis or Young (SM 1350).

After April 4, 1963, no statements of account were asked of MGM and none were prepared by MGM until statements were supplied to Landau of the accounts of Curtis and Young as at June 7, 1963 (Exs. S, T; SM 1342–43). These show that at that date MGM had been paid in full (including the presumably improper charges of $6,712.63 and $2,153.96) and held a credit balance for Curtis of $222.49 and a credit balance for Young of $4,119.39. This last credit balance included a mistaken credit to Young of $4,048.07 but there was a small credit balance in favor of Young nonetheless.

Even after knowledge that MGM had been paid in full, the Bureau made no effort to collect accounts receivable.

The Referee found (Op. 27) that against assigned accounts receivable of $82,280, there was collected after April 4, 1963 $75,682. This leaves uncollected $6,598 of such accounts plus the $12,095 of "doubtful accounts" (Ex. 6, p. 4). Of the accounts actually collected, $8,866.59 were absorbed by the presumably improper or at least questionable charges of MGM, and this came to pass because the Bureau turned over payments to MGM without knowing of the $8,866.59 charges made by MGM.

The neglect of the accounts receivable by the Bureau between April 4, 1963 and June 27, 1963 is established by the record. This neglect includes a complete failure to deal vigorously with MGM to discover the state of affairs, to coordinate efforts to collect, and to protect Curtis and Young against improper charges. The criticisms of the Referee are justified.

I have disregarded in this connection the activity or inactivity of the Bureau after June 27, 1963 when the bankruptcy petition was filed. Talcott contends that the Bureau was then prevented by the Act (Section 69d, 11 U.S.C. § 109(d)) from any administrative activity. This contention is accepted, although the attitude of the Bureau in the bankruptcy proceeding is far from reassuring, as is also that of Talcott, a general creditor with a minimal interest in the estate.

## C.

The Referee was properly critical (Op. 23–24, 45, 63) of the failure of the Bureau as assignee to inquire about goods at contractors and to attempt to salvage something therefrom.

It will be recalled that Curtis and Young cut the piece goods for their dresses at the Seventh Avenue premises, but the cut piece goods were then sent to outside contractors for sewing into finished garments. At any given time, therefore, Curtis and Young would own cut piece goods in process at sewing contractors who would have a lien for their labor.

When Harry first came to the Bureau on April 3, 1963, he told of the inventory at sewing contractors and gave the names of the contractors (Ex. 21; SM 633, 876, 883).

The Bureau thus knew from the beginning that inventory belonging to Curtis and Young was in the possession of contractors (SM 876). After the meeting of creditors on April 8, 1963, the Bureau staff man called this fact to the attention of counsel and let "them take it from there" (SM 884, also 876). The Bureau did nothing else about this inventory (which as will be seen was substantial) and never found out what happened to the inventory (SM 885–86). Indeed, the record does not disclose what did happen to the inventory.

The total inventory of the two companies at April 4, 1963 was $53,210 (Ex. 6, p. 4), of which $13,800 was in the Seventh Avenue premises and $39,410 was at contractors (Ex. 6, p. 3).

Landau was able to determine which contractors had goods of Curtis and which had goods of Young. The Landau report shows that Curtis owed to contractors $13,781 (Ex. 6, p. 5). This can only be made up of the following items:

| | | |
|---|---|---|
| Artstyle Dress Co. (secured) (Ex. 6, p. 11) | | $ 9,004 |
| Abelon Dress Co. (unsecured) (Ex. 6, p. 17) | | 4,777 |
| | | $13,781 |

The Landau report shows that Young owed to contractors $30,340 (Ex. 6, p. 5). This can only be made up of the following items:

| | | |
|---|---|---|
| Patti Ann Fashions (secured) | (Ex. 6, p. 11) | $ 5,331 |
| S & S Sportswear (secured) | (Ex. 6, p. 11) | 23,748 |
| Nancy Frocks (unsecured) | (Ex. 6, p. 17) | 1,112 |
| Fortunato & Fortunato (unsecured) | (Ex. 6, p. 17) | 149 |
| | | $30,340 |

The Referee appears to have been mistaken in supposing (Op. 24) that Curtis had some interest in the inventory at S & S Sportswear; this must have belonged to Young.

The Landau report does not disclose how much inventory was at each contractor. It merely states that this "merchandise is being sold by the contractors in order to satisfy their claims" (Ex. 6, p. 7).

The failure of the Bureau to exercise any supervision over the liquidation of inventory by the contractors is inexcusable and far below ordinary standards of due care. Not only did the Bureau fail to supervise; it never even took the trouble to inquire and find out what was happening. Telling the lawyers was not sufficient to pass responsibility. The problem was one of business, not of law.

The criticisms of the Referee are justified.

D.

The Referee was properly critical (Op. 30–32, 62) of the neglect of the Bureau to obtain and surrender three life insurance policies owned by Curtis and insuring the lives of Harry and Eloise. They are shown on the Landau report as having a cash surrender value of $2,379 (Ex. 6, p. 4).

Harry testified that he told the Bureau of these policies "when it first happened" (SM 1675) which would be April 3, 1963. It is admitted by the Bureau staff man that he knew about the policies on April 8, 1963 (SM 743–45, 812). Herbert reported these policies on that day as among the assets of Curtis (SM 812, 816).

The Bureau knew that the policies had not been on the Curtis premises and, of course, had not been turned in by the Bureau custodian sent to the premises (SM 815–16).

The Bureau did nothing to obtain the policies and thus, of course, could not and did not surrender them. After the June 7, 1963 meeting of creditors, the Bureau staff man asked its lawyers "what steps should we take" about the policies and was advised that "as soon as we were the trustee in bankruptcy, then we could proceed to trace down the life insurance" (SM 819).

In fact, the policies at the time were in Harry's possession and could easily have been secured by asking him or the bankrupt's counsel for them. The Bureau did nothing of the sort (SM 819). Indeed, Harry was at the April 8, 1963 meeting of creditors when the policies were reported. The Bureau knew they had not been found on the premises, but Harry was not asked about them (SM 819).

Harry turned the policies over to counsel for the bankrupt Curtis in November 1963 (SM 1676–77). Counsel turned over the policies to Foley on March 16, 1964 at a Section 21a examination when Harry pointed out that it would be well to surrender the policies promptly for their cash value because the "cash surrender value dissipates itself" (SM 1675).

The importance of surrendering life insurance policies promptly after bankruptcy is because when premiums then become due the insurance company considers the premiums paid and adds the amount as a loan, which reduces the cash surrender value. Whether this may properly be done need not be decided.

It would have been ordinary prudence for the Bureau to have secured the policies promptly and have surrendered them for their cash surrender value. This would have obviated any controversy with the insurance companies. Apparently the failure of the Bureau to do so resulted in such a controversy, requiring a civil action by the receiver against the insurers (Op. 30).

The failure of the Bureau promptly to secure and surrender the insurance policies appears to be inexcusable neglect. The criticisms of the Referee are justified.

E.

The Referee was critical of the Bureau in a number of other respects, for example, in its disbursements to the custodian, to the auctioneer, to the warehouseman (Op. 64). These remaining criticisms seem to me of relatively minor importance and not significant for the decision here.

The activity and inactivity of the Bureau as assignee of Curtis and Young from April 4, 1963 to June 27, 1963 could properly be found by the Referee as performance in a confused and careless fashion, not consistent with the standards of ordinary care and prudence. The Referee could properly conclude on the basis of this performance that the Bureau should not be approved as trustee of Curtis.

The decision of the Referee disapproving the Bureau as trustee of Curtis is well within the permissible limits of discretion.

## IV

Having found that the Referee's disapproval of the Bureau as trustee was a proper exercise of discretion, the next issue is whether the Referee was authorized to appoint a trustee or whether he should have called for the election of another trustee by the creditors.

Section 44a of the Act (11 U.S.C. § 72a) provides in relevant part as follows:

"The creditors of a bankrupt * * shall, at the first meeting of creditors * * * or after a vacancy has occurred in the office of trustee * * * appoint a trustee * * *. If the creditors do not appoint a trustee or if the trustee so appointed fails to qualify as herein provided, the court shall make the appointment."

Section 2a(17) of the Act (11 U.S.C. § 11a(17)) gives authority to the Referee to "[a]pprove the appointment of trustees by creditors".

Section 45 of the Act (11 U.S.C. § 73) is entitled: "Qualifications of * * * Trustees". It provides, among other things, that a trustee must be an individual "competent" to perform his duties or a corporation authorized by law to act as trustee.

Section 50b of the Act (11 U.S.C. § 78b) provides that a trustee "shall qualify by entering into bond to the United States".

Is the expression "fails to qualify" as used in Section 44a limited to failure to file the bond required by Section 50b or does it refer to a failure to qualify for any reason, including failure to secure approval by the Referee either because not "competent" under Section 45 or for some other good cause? If the former limited meaning is correct, then the Referee had no power to appoint in the case at bar. If the latter and more liberal meaning is correct, then the Referee did have power to appoint in the case at bar.

The only decision cited on the point is by Judge Bartels in In re 4847 Merrick Road, Inc., 250 F.Supp. 929 (E.D.

N.Y. 1966) where, after a thoughtful discussion, Judge Bartels held that the limited meaning was the correct one. Our Court of Appeals took note of the point in the case at bar but declined to express an opinion (326 F.2d at 701).

After giving great respect to the views of Judge Bartels, I must disagree with his conclusion.

Under the Bankruptcy Act of 1800, commissioners were appointed by the judge to take possession of the bankrupt's property (2 Stat. 21, 23; 10 Collier (14th ed. (all references to Collier herein are to this edition)) 1721–1723).

Under the Bankruptcy Act of 1841, an assignee was appointed by the judge for the property of the bankrupt (5 Stat. 442; 10 Collier 1739).

Under the Bankruptcy Act of 1867, for the first time it was the creditors who chose the assignee but their choice was "subject to the approval of the judge" (14 Stat. 522; 10 Collier 1752) and it seems clear that upon disapproval the judge could appoint an assignee because there was this provision: "Vacancies caused by death or otherwise in the office of assignee may be filled by appointment of the court, or at its discretion by an election by the creditors * * *" (14 Stat. 525; 10 Collier 1757).

Under the Bankruptcy Act of 1898, the creditors were given the right to appoint a trustee in every situation. The language of Section 44 was (30 Stat. 557; 10 Collier 1806):

"The creditors of a bankrupt estate shall, at their first meeting after the adjudication or after a vacancy has occurred in the office of trustee, or after an estate has been reopened, or after a composition has been set aside or a discharge revoked, or if there is a vacancy in the office of trustee, appoint one trustee or three trustees of such estate. If the creditors do not appoint a trustee or trustees as herein provided, the court shall do so."

Thus, under the 1898 Act, the only time when appointment was by the court was when the creditors failed to appoint.

In the 1898 Act, there was no provision for approval by the court of the choice of creditors. However, the Supreme Court provided for such approval. The Act gave authority to the Supreme Court to prescribe rules of procedure and in the General Orders promulgated on November 26, 1898, Order 13 was as follows:

> "The appointment of a trustee by the creditors shall be subject to be approved or disapproved by the referee or by the judge; and he shall be removable by the judge only."

The legislative history of the 1898 Act does not show that the right to elect a trustee was conferred on creditors on any theory that they were beneficiaries of a trust estate. The reason for enacting Section 44 was given in the analysis of the bill by the House Committee on the Judiciary as follows (H.R. Rep. No. 1228, 54th Cong. 1st sess. 47 (1896)):

> "Complaints were made during the time the last bankruptcy law was in force that the judicial discretion invested in the judges was abused in certain districts in the interest of favorites who were standing candidates as assignees of bankruptcy estates. To avoid the possible recurrence of such a complaint, it has been provided that the creditors may appoint the trustee, but in default the court will make the appointment to avoid delays in the administration of the estate."

Judge Addison Brown of this Court decided in 1899 that, under the 1898 Act, upon disapproval by the Referee, another trustee had to be appointed by the creditors and could not be appointed by the court. In re Lewensohn, 98 F. 576, affirmed "on opinion below", 104 F. 1006 (2d Cir. 1900). Judge Brown found that when the Referee disapproves the choice of creditors, "there is a vacancy in the office of trustee", the then

language of Section 44 of the Act. He contrasted this broader language with that of the earlier clause of Section 44, "[a]fter a vacancy has occurred in the office of trustee", which Judge Brown said referred to a situation where "the office was previously filled" (98 F. at 579). Thus, Judge Brown concluded that, after disapproval by the Referee, the clause of Section 44 giving creditors the right to appoint whenever "there is a vacancy in the office of trustee" was applicable because the wording of this clause made it applicable whether the office was "previously filled or not" (98 F. 579). Judge Brown was of the view that when the trustee chosen by the creditors was disapproved by the Referee, the office had never been filled. The Court of Appeals for the First Circuit expressly so decided and said that disapproval by the Referee meant that there was "the failure of a condition precedent that must be met before the office of trustee is filled" and that "until such approval there is still a vacancy in the office of trustee". In re Kellar, 192 F. 830, 832 (1st Cir. 1912).

Election of trustees by creditors, as provided in the 1898 Act, did not prevent abuses in bankruptcy proceedings.

An investigation of such abuses in this District was ordered by this Court in March 1929. Hearings were held that year before Judge Thacher, three bar associations participating. Counsel to the associations was Colonel Donovan. After the hearings, a written report (the "Donovan Report") was submitted to this Court by counsel to the bar associations under date of March 22, 1930 (the report was printed in 1931 by the United States Government Printing Office for the use of the House Committee on the Judiciary, House Committee Print, 71st Cong., 3d sess.).

The Donovan Report went carefully into the causes of the abuses found to exist. One of the chief causes was found to be that "the theory on which the whole administrative structure rests" had "broken down in practice" (p. 8); this theory was "that the creditors in

each particular case will control, supervise and successfully manage the administration" (p. 8). The failure on the part of creditors was described as follows (p. 10):

"Creditors are not wholly to blame for this situation. Circumstances differ from those existing when the Act was passed in 1898. With the rapid growth of the machinery of credit, creditors in bankruptcy cases are located in various parts of the country. They cannot directly participate in administration. They either take no part at all or forward their claims for filing to the first collection agent or attorney who solicits them. They have learned by bitter experience that bankruptcy too often means a total loss of their claims. As appears from Table V (A), nearly two-thirds of all bankruptcy cases in the country are cases in which no assets are recovered for creditors. The average return to creditors on their claims has amounted in the last four years throughout the country as a whole to a little more than 8% (Table I). In these circumstances, creditors as business men prefer to write off their claims rather than spend valuable time in an apparently fruitless endeavor to salvage something from the wreck."

The Donovan Report recommended, among other things, that "creditor control should be limited to those cases in which the creditors have a genuine interest" (p. 12).

Judge Knox has given a lively description of the bankruptcy investigation and the Donovan Report in "A Judge Comes of Age" (New York 1940), pp. 196–212.

In April 1930, Judge Thacher became Solicitor General. In July 1930, the President announced that he had authorized an "exhaustive investigation into the whole question of bankruptcy law and practice" under the direction of the Solicitor General. Under date of December 8, 1931, the Attorney General submitted the report of the investigation (the "Thacher Report"). Under date of February 29, 1932, the President transmitted the report to Congress. The letter of transmittal included these statements (S. Doc.No. 65, 72d Cong., 1st sess. xi, xii):

"The present bankruptcy act is defective in that it holds out every inducement for waste of assets long after business failure has become inevitable. It permits exploitation of its own process and wasteful administration by those who are neither truly representative of the creditor nor the bankrupt.

\* \* \* \* \* \*

"The choice of the liquidating personnel should be limited to competent individuals or organizations after careful consideration by the courts of their qualifications and ability to maintain an efficient and permanent staff for the conduct of the business."

The Thacher Report referred to the Donovan Report which had already been printed for the House Committee. The Thacher Report contained these statements (S. Doc. No. 65, 72d Cong., 1st sess., 3, 6):

"The purely administrative provisions of the present act were constructed on the theory—possibly justified under the conditions of trade during the years prior to 1898, when the act took shape—that only the creditors are concerned in the administration of the estate, the examination of the debtor and his discharge and can be relied on to meet together, elect competent trustees, and determine problems of administration, and that in cases involving fraud they will be active in detecting and establishing the facts, and at their own expense will protect the public interest.

"Thus, though carefully drawn and thoroughly considered, the act of 1898 was altogether a novel experiment in bankruptcy legislation, and under the stress of greatly changed social and economic conditions it has had quite unforeseen consequences, the most serious of which have resulted from the failure of the theory that the creditors can be relied on to take charge of the

management and enforcement of the act.

\* \* \* \* \* \*

"In practice we have found that debtors usually have such meager assets by the time their estates are brought into bankruptcy that it would make little difference whether these assets were paid preferentially to one creditor, or were distributed to all in fractional proportions, or, as is often the case, were consumed in fees and expenses of administration."

The Thacher Report recommended that the election of trustees by creditors be continued but that the choice be restricted to those authorized by the court to act as trustees (pp. 107–08).

The recommendations in the Thacher Report were not accepted by the Congress and it was not until 1938 when the Chandler Act was passed that the Bankruptcy Act of 1898 was subjected to wholesale revision. The Donovan Report and the Thacher Report are here referred to in order to show that Congress had before it information indicating that so-called creditor control of bankruptcy administration had not been successful in practice.

In the 1938 amendments, Congress moved in the direction of restricting the appointment of trustees by creditors and enlarging the power of the court to appoint. Congress did this in the Chandler Act by amending Section 44 so that in relevant part it now reads as follows (matter in brackets is omitted by the amendment, matter *italicized* is added by the amendment):

"*a.* The creditors of a bankrupt [estate], *exclusive of the bankrupt's relatives or, where the bankrupt is a corporation, exclusive of its stockholders or members, its officers, and the members of its board of directors or trustees or of other similar controlling bodies,* shall, at [their] *the* first meeting *of creditors* after the adjudication, or after a vacancy has occurred in the office of trustee, or after an estate has been reopened, [or after a composition has been set aside or a discharge revoked, or if there is a vacancy in the office of trustee] appoint [one] *a* trustee or three trustees of such estate. If the creditors do not appoint a trustee [or trustees as herein provided] *or if the trustee so appointed fails to qualify as herein provided,* the court shall [do so] *make the appointment.*"

The 1938 amendments also gave the court the express power of approval or disapproval of the choice of the creditors (Section 2a(17); 11 U.S.C. § 11a(17)).

The action by Congress significant for the case at bar is the elimination from Section 44 of the broad power of creditors to appoint "if there is a vacancy in the office of trustee" and the extension of the power of the court to appoint if the trustee appointed by the creditors "fails to qualify as herein provided".

The only reason given by Congress for changing the method of appointment was to avoid a "new election" which would result "in the expense and delay of calling another meeting of creditors". (H.R.Rep. No.1409, 75th Cong., 1st sess., 16).

Having in mind the purposes of the amendment and the specific changes thereby made, the clause "fails to qualify as herein provided" must mean a failure to qualify for *any* reason; it does not seem to refer solely to a failure to qualify by reason of failure to enter into the bond required by Section 50b.

The word "herein" in Section 44a must refer to the Act as a whole. The reference could not be to Section 44 itself because this does not deal with qualification of the trustee. It seems illogical to say that "herein" refers only to Section 50b (11 U.S.C. § 78b), which is headed "Bonds", and does not refer to Section 45 (11 U.S.C. § 73) which is headed "Qualifications of Receivers and Trustees".

Moreover, if the Referee cannot appoint a new trustee after disapproval of the creditors' choice, then what is the authority for the creditors to appoint in that event? The only provision of Section 44a which could possibly be cited in this con-

nection is the provision for appointment by creditors "after a vacancy has occurred in the office of trustee". But these words seem applicable only if the "office" has at one time been filled. "Occur" means to be "found or met with", to "appear", to "present itself", "come to pass", "take place", "happen" (Webster's Third New International Dictionary 1561). The earlier decisions cited are also authority for this conclusion, namely, the *Lewensohn* decision of Judge Brown, affirmed by our Court of Appeals, and the *Kellar* decision in the First Circuit. Thus, the office of trustee has never been filled if the choice of the creditors is disapproved and no "vacancy has occurred in the office of trustee" (the language of Section 44a). There is accordingly no authority in the statute for appointment of another trustee by the creditors after disapproval of their choice by the Referee.

Section 44a, as amended in 1938, seems internally consistent therefore only if "fails to qualify" means a failure to qualify for any reason and not merely for an omission to file a bond.

This meaning also seems more in accord with sound policy, not only because the delay and expense of a second meeting of creditors is avoided but because *general* non-priority creditors (who elect trustees) are so often, as in the case at bar, without any substantial interest in the estate.

When the Bankruptcy Act of 1898 was enacted and even when the 1938 amendments were adopted, taxes were by no means so important as now. Priority tax claims might in those days be expected to be paid in full with an excess for distribution to general creditors. There was more reason for assuming some interest in the estate on the part of general creditors.

Nowadays it is more and more true that the beneficiaries of the estate are the federal, state and municipal governments and that the general non-priority creditors (who alone vote for trustees) are without any interest because the prospects of any distribution to them are small.

The latest available statistics are for the fiscal year ended June 30, 1965 and are contained in "Tables of Bankruptcy Statistics" published by the Administrative Office of the United States Courts. There were 145,655 straight bankruptcy cases (that is, exclusive of Chapters X–XIII cases) concluded after adjudication of bankruptcy. Of these, 127,142 or 87.-3% were cases where there were no assets or nominal assets ("nominal" meaning not enough to pay administration costs); there were 18,513 asset cases or 12.7% of the total. In the 18,513 asset cases, priority creditors received 37.6% of their claims, secured creditors received 60.7% of their claims, and general creditors received 7.5% of their claims (the percentages received by creditors in asset cases in this Court for the same period were respectively 18.1%, 96.2% and 15.8%).

The Collier treatise (2 Collier 1660–61) supports the view here taken of the correct meaning of Section 44a.

There is a full and acute "Comment" on the problem in 34 Fordham Law Review 488 (1966).

The Remington treatise concludes that the Referee, upon disapproval, has no power to appoint. This is the statement (2 Remington (Henderson 1956 ed.) 562):

"The referee has at no time the right, upon disapproval of the creditors' choice, at once and summarily to appoint a trustee himself."

But the statement in Remington commands no confidence (a) because the 1938 amendment is not even mentioned and (b) the cases cited by Remington are all before the 1938 amendment. Moreover, Remington is in error in believing (contrary to Judge Bartels and to the contention here of Talcott) that if the trustee chosen by creditors fails to give bond, it is the creditors—and not the court—who then have the right to appoint (2 Remington 575).

For the reasons given, I conclude that upon disapproval of the choice of creditors as trustee, the appointment of an-

other trustee is properly to be made by the Referee and not by the creditors.

On the petition of Talcott to review, the order made by the Referee on March 15, 1966 is in all respects approved and confirmed.

So ordered.